The Immigration Judge in this case denied asylum to a Kurdish dissident from Iran because of a negative credibility finding based on five conclusions, none of which were supported by substantial evidence. First, the IJ relied on Petitioner's failure to apply for asylum in France or Mexico en and this court precedent does not allow failing to apply for asylum in another country to support a negative credibility finding. Second, the IJ relied on Petitioner's statement that he came here for medical treatment for his wife, which a statement that he made to a border patrol agent when he was arrested after nearly drowning in the Rio Grande River. The one wife came here sick and then she had a couple seizures. He couldn't take care of her because she was working, didn't have anyone else take care of her, so he sent her back to Iran, as he explained it. Well, actually, Your Honor, this is that case, but the woman actually went into a coma and basically the family thought she was dying and so the parents wanted her to die at home. Let me ask you a question. I may be interrupting you too soon, but I was trying to deal with this passport explanation and the significance of its issuance after the first arrest and before the second arrest and it seemed to me that the Administrative Law Judge's consideration of that, that it Well, that he testified that it was issued at a different date? Issued in 92, according to the testimony of your client, but it's dated 95, so he explains that by saying it was changed by the smuggler so that he could get out, it wouldn't be before the first arrest, but it seems to me that the conclusion was if that explanation was true, then it would have been issued after, it would have been dated after the second arrest, and so the implication was what you have is a passport that was issued in 92 and you had no trouble leaving the country with an old passport even after two arrests, and of course the implication, according to the Administrative Law Judge, was that you changed the date to try to show that there was some fear of persecution. Well, Your Honor, the, what he testified to was that the passport that he had obtained himself from the authorities was issued in 1992. There was a copy of a passport, which was the passport he traveled upon in the record, which reflected a date of 1995, and he was speculating as to why it might be. He wasn't sure because what had happened was he had paid an agent to assist him in leaving the country and then getting exit visa stamps, the agent had gotten the exit visa stamp for him and gotten proper visas and all of that, and so he was speculating about that he must have changed the date also and why he might have done that, because it would have been after this first arrest, but ultimately that, it seems to me that's not true. Well, this court has determined that being able to exit a country and even being able to get a travel document does not go to the heart of the claim and is not fatal to an asylum claim, and as, particularly in a situation like this where he did have an intermediary, he paid $5,000 to that intermediary to safely shuttle him out of the country. There's a second problem here besides the one that Judge Whaley has identified, which is that the IJ said that the photos that are on the passport, which bears the date of October of 1995, include the petitioner's wife and daughter, and they appear to be, judging from the picture of the daughter, appear to be in 1995, not from 1992. So the pictures appear to be contemporaneous with the date on which the passport was actually issued. That would seem to, that casts into doubt whether the petitioner would have been arrested, because it's unlikely that the government would have issued him a passport in 1995 if he had been arrested earlier. Well, actually, what the record reflects is that he got a passport in 1992, and then his child was born in 95, and he put her name on that, on the passport, because they couldn't put an infant photo, and the baby was born in January, and he couldn't put a, they don't allow photographs of infants on his passport. So the passport that he had did not have a photo of the child, but he'd given it to an agent, and the agent had asked for a bunch of photos. So presumably, the agent had dealt with the photos to get everything consistent so that the issue date and all of that comported with the photos that were on the passport. So he never testified that he put that photo on that passport. I mean, that was something that the agent had done. Yeah, we still have some problems with the dates, though. I mean, the dates, the explanation just doesn't seem to match up with the dates. The, well, because the, I'm sorry, and I'm not sure why. Well, going back to Judge, part of Judge Whaley's question, if the, if the agent, if the agent's explanation to, to Mr. Hashimi is credible, that he needed to change the date in order to make it appear after the arrest so that the government wouldn't be able to correlate his arrest with the, with the passport, then why wouldn't, if he had dated it after the second arrest rather than just after the first arrest? Well, and that's where he just simply had to speculate. He, he didn't know because, and this Court has held that even misrepresentations about a travel document, I mean, even if he was making misrepresentations about the travel document, this Court has held that that doesn't go to the heart of the claim. Sometimes. And, well, in this case, in terms of going to the heart of the claim, I mean, he, his, his worst arrest was in 1998, several years after the, the, the 1995 arrest. That was when he was detained for six months. I think whenever we say doesn't go to the heart, we always have an adverb in front of it, like doesn't necessarily go to the heart. Well, I would submit that this does not go to the heart of the claim as to whether, I mean, whether or not a passport was issued in 1995 when he remained in the country for several years and then ended up traveling after the second arrest, which was the, which was the, the harshest arrest, where he was detained for so long and, and suffered such horrible treatment. Counsel, let me give you, let me give you a question which does, I think, go to the heart and which is troubling to me, and that is the inconsistency in the number of days in which he, he was subject to arrest on his first arrest. As I look at the record, in his first application, he said several days. On his second application, he said four days. I don't see any, any inconsistency between those. He then adds an amendment or a correction, and he says, I was held for 14 days, and then during his testimony, he said that he was held for 10 days, and so I'm having trouble between the four days, 10 days, and 14 days understanding what, where the truth is. Well, Your Honor, the first statement says several. The second initial statement said four, but then he did submit a correction sheet, and that correction sheet is on the record, where he explained, it's at 439, where he explained that that was a miscommunication, that he was detained for four days, and then, I mean, he was detained for four days in solitary confinement, then he was taken out and beaten, and then detained 10 days, during which he was also beaten. He corrected that discrepancy before going into court, and then in court, that is what he testified to. He testified to being held for four days without any, he was in solitary confinement, and then he was taken out, beaten, and held additional 10 days. So he was consistent with the correction sheet that he had submitted to the court. And I think the court simply just didn't see that correction sheet. And, and then, so then you're, it's really boiling down to a difference between. Well, I'm looking at page 480, which I believe is the second application, and he, this is where he says that on the fourth day, a man blindfolded me, led me down the hall, he was beaten and tortured. The policeman then beat him and forced me into a car, drove me into the city and released me. Right, and that's what he corrected. He said, and he said that in court, he said he realized that was a mis, that he, there was a miscommunication between his attorney, and so he'd asked his attorney to submit a correction sheet. And so that should be on the 14th day? Which was done on 439. Yes, that's correct. The correction sheet is at 439, explaining that he was held for four days, beaten, and then held for an additional 10 days. What's the record from his lawyer that that was a miscommunication? He, he stated that in the record when the, when the IJ, when the IJ asked him about it, he said that he had asked his attorney to make that correction for him, because it was a miscommunication. That's his explanation of how it should be changed from 4 to 14. But does the lawyer say I misinterpreted that? Is there anything in the record from the other, the person that's allegedly misinterpreted it? Well, the attorney submitted the correction sheet for him. But no, I mean, there was no testimony from the attorney. That's generally not even permitted. But the attorney had submitted a correction sheet, which is pretty routine. When you're, you know, there's so many details that there might be minor errors and you need to, and miscommunications. And so you submit a correction sheet. And that's what was done before he ever testified. So it's, and he never testified to the several either. And it really boils down to his 14 and several. Is that, does that support substantial evidence? And I would argue it does not. And particularly given his explanation that in his mind, that is, that, that isn't an inconsistent statement. Counsel, what, what do we do with the IJ's comments on demeanor? This is, this is, this is the point where, where, where we can, we can have a, we can have a discussion. And I think you've been very helpful and I appreciate everything that you've said. Trying to point out how he's corrected the record and how perhaps it can be reconciled on the cold record. But what do we do when an IJ says, I sat here, I watched the witness, I've seen his body language, I've seen the way he talks, I've seen the way he smiles when asking questions, and I don't believe him. Well, ultimately, she didn't say all that. I understand. I'm characterizing how one might approach demeanor. But she was, she was pretty tough on him. Well, she, she made some statements that she basically supported with one phrase, which was, in particular, he smiled during a portion of the testimony. And he actually, she actually misstated the testimony there. She said that he smiled during the five months of detention. And elsewhere, she said his, his, his, his recounting of this had all of the appearances of a well-rehearsed story. But she did not explain how, how, how that was. And that's something that can be reviewed from the record in terms of, because this is a record, and see if it's supported, if the record supports her characterization. And in terms of his reciting the story, there's, there's plenty of evidence of him taking, going off of his declaration, describing his emotional feelings. And also, frankly, I mean, he, most of the hearing, he was, he was answering questions from the judge, so it would be difficult to, to, to memorize what the judge is going to ask. I mean, he, he was candid with the judge, answered every question that she posed to him in a candid, forthright way. There's nothing that says he was not responsive. And so, ultimately, there's this one line where she misstates how long he was detained, which shows that she wasn't paying very much attention. She said he was detained for five months. He was actually detained for six, and that, or about six. And when he, and when, and she said that he was smiling. And it was never put on the record. She, she never stated it for the record. She stated it outside of the presence of the parties, because she, she gave this decision outside of the presence of the parties. The parties were not present. She never confronted him with that evidence. And, and, so, first, I would say that she, she needed to at least put it on the record and confront him with it, because that is typically done in immigration court when there's nonverbal communication, when people are waving their hands and describing things. The judge, it's very easy to just say what the, what the, what the action is doing. But beyond that. Counsel, you better, better start wrapping it up. You're way over time. Okay. But beyond that, I would say that even if he was smiling during one very brief portion of his testimony, that can't be enough to find otherwise credible testimony not credible. Thank you, Counsel. May it please the Court. My name is Demetri Rocha, and I represent the United States. In this case, this is a case about a well-educated native and citizen of Iran who entered the United States. I'll tell you what's on my mind in this case. The man's a Kurd, and they get kicked around all over the Middle East. So it's plausible that they would have some political problems. His father, he says, was a radical pro-Kurdish professor. And I think his father and his brother were politically active. And nothing implausible about that. And you would think that would attract some attention. And the IJ didn't believe the man, partly because of demeanor, as Judge Bybee pointed out. But I had trouble when I read the IJ's decision, figuring out exactly what was so wrong. And the more she talked, the less I understood. Like the part about his wife's health. If his wife really was in bad health, he would have done this or he wouldn't have done that. I couldn't understand why. I couldn't understand what was the matter. It leaves us with the date discrepancies. And our decisions don't seem to allow us to, sometimes they allow us to give way to them, and sometimes they don't. And I don't, I guess what I need you to do for me is explain exactly what it was about the story that made it so implausible. I think, first of all, the most important thing was the fact that, or one of the most important things was the fact that when, after Petitioner entered the United States, he told the Border Patrol INS officer that they were entered, the sole purpose, quote unquote, sole purpose was to enter the United States for medical treatment for her. Now, while there may be some issues, whether that's something that's admissible into court, the most important fact about that is that he admitted that those, before the IJ, he admitted those statements, that he made those statements to the INS officer. So there's no, there's no question or controversy about the actual statements he made before the Border Patrol officer. What's the problem with that? I mean, he's obviously got a sick wife, and she got sicker. And if at the moment she seems especially sick and that's what's on his mind, and then later on he mentions other purposes that he also has, what's the problem? Well, the problem is that he, he traveled from, from Iran to the United Arab Emirates, to, he had a visa there, then a visa to France, and then a visa to Mexico. If, in this, you know, let me emphasize again that the standard review here is that what you're reviewing must compel a contrary conclusion, which this is not a de novo, de novo review. But when, the fact of the matter is, it appeared that he was, he had a valid visa to France, he had a valid visa to Mexico. He acknowledged in his testimony before the immigration judge that he knew he was entering the United States illegally. And if he, if his wife was so sick, the immigration judge held that she found it unbelievable that basically he would be taking his wife all across the entire world essentially to, to solely, to go to the United States solely for, for any other reason other than the reason he stated, which was for medical care, medical treatment. If he, if he was solely, if they were solely fleeing, if the reason they were fleeing was because they were afraid of some sort of political persecution, they had stops in France, they had stops in Mexico that they could stay there. I've always thought that the immigration law should probably be the first place you get into that has a comparable asylum law. That should be the place you have to seek asylum as opposed to the richest country. But that's not the law. Fortunately, no, that's not the law. But, but as far as going to the U.S. for medical treatment, to me it seemed plausible that he'd say that. First of all, the more you travel, the sicker you get if you're sick to start with, just because it's so exhausting. And, and second, this is a really good place where you need super duper medical care and you have no money because you can just walk into an emergency room and get it. That's correct. And I think that's what, what the immigration judge hinted at was the state, once again, the statement that he made at the border and also the fact that he basically took his, his wife and child all the way from Iran all the way to the United States when he had safe places to stay. And I understand the case law in this circuit states that, you know, that sole reason, the I once traveled with pneumonia from Istanbul to Fairbanks, Alaska without a stop off for medical treatment in between. It's nice to get home when you're sick, even though you get sicker on the way. I don't understand what the implausibility. I think the, another factor that was important for the immigration judge mentioned was the fact that once she allegedly became so sick in the United States and that they could not to Iran and if I, right. And the fact that she went back to Iran to receive medical treatment too, that's also in the record that because he quote unquote cannot afford medical treatment in the United States. And that's the factor. What's the one factor that came home here for 30,000 a month nursing home there for a few pennies a day? I'm not sure. I don't know, but I would suspect that. And I think if you ask what's the one factor that changed between the time that petitioner and his wife arrived in the United States and the time that she returned to Iran, it was because she could not afford medical treatment has nothing to do with any sort of alleged persecution or potential fear of persecution. I know that the court also brought up issues about demeanor and the law on the circuit. I mean, my inclination is to treat IJs like juries or trial judges. And if they say, I don't believe this person, they look to me like they're lying. It's good enough. Only under our precedence, we can't do it. Well, I think the precedence does say that it should give substantial weight to the IJs determination, especially in this case, when he stated that she stated that the petitioner appeared to be reciting memorized facts and also the fact that the one time when he was speaking about his alleged torture, I believe in the second second arrest, he was smiling the entire time. And she she thought this was one of the biggest events that occurred or the biggest. Notice people commonly smile when they run red lights and narrowly avoid an accident seems to be a stress reaction with a lot of people. Well, this is this is what we're doing right now is trying to review old facts, and that's what the case law states that we should grant that we should grant substantial deference to the IJs determination. And we can't unless we're compelled to get to a contrary conclusion. The IJs decision stands. And that's I mean, the standard the case begins and ends with a standard review in the situation. If there are no further questions. Thank you, counsel. Hashimi Hafizi is submitted. Next is Galstian versus Gonzalez. Sorry about the pronunciations. I have no idea how to pronounce anything in these foreign languages.
judges: Kleinfeld, Bybee, Whaley